Hillsborough
No. 80-277

THE STATE OF NEW HAMPSHIRE

v.

MICHAEL A. SCARLETT

January 28, 1981

38

*Gregory H. Smith*, acting attorney general (*Martha V. Gordon*, attorney, orally), for the State.

*Bruce E. Kenna*, Hillsborough County Public Defender, by brief and orally, for the defendant.

GRIMES, C.J.  This aggravated felonious sexual assault case is before us for the second time. In the first appeal we remanded the case to the superior court for a new trial. *State v. Scarlett*, 118 N.H. 904, 395 A.2d 1244 (1978). In the present appeal the defendant contends that the second trial violated his right not to be put in jeopardy twice for the same crime. He also challenges the competency of certain juvenile witnesses, the sufficiency of the evidence, and the admission of alleged hearsay evidence. We overrule the defendant's exceptions and affirm.

When this case was here before, we held that the trial court should have declared a mistrial because the prosecutor had exhibited a blood-stained bedspread to the jury knowing that it would be inadmissible without the testimony of a chemist whom he did not intend to call as a witness and knowing that its admission without such foundation testimony could be accomplished "only through defense counsel oversight coupled with judicial error." *State v. Scarlett, supra* at 905, 395 A.2d at 1245–46. We stated that "[t]he State overreached when it displayed the bedspread to the jury under these circumstances." *Id.* at 905, 395 A.2d at 1246. On remand, the defendant moved to dismiss on double jeopardy

grounds. The court denied this motion, and the jury again convicted the defendant. At the second trial, the court properly admitted the blood-stained bedspread into evidence, the State having established a foundation for its introduction with the testimony of a chemist. *Randall*, J., transferred the defendant's exceptions.

■ When, by reason of prosecutorial or judicial overreaching which is intended either to provoke the defendant "into requesting a mistrial or to prejudice his prospects for an acquittal," the defendant requests and obtains a mistrial, the double jeopardy clause of the fifth amendment prohibits a retrial. *United States v. Dinitz*, 424 U.S. 600, 611 (1976); *Bell v. State*, 286 Md. 193, 204–05, 406 A.2d 909, 915 (1979). We are of the opinion that the overreaching involved in the prior trial of this case is not of the character which will invoke double jeopardy protection.

■ The bedspread which the prosecutor displayed to the jury was admissible with a proper foundation. The action of the prosecutor is distinguishable from the prosecutor's conduct in *Miller v. Pate*, 386 U.S. 1, 6 (1967), in which shorts with red stains were exhibited to the jury with full knowledge that the stains were paint and not blood. In the present case, the stains were in fact blood. Furthermore, the prosecutor did not exhibit the bedspread to provoke a mistrial or prejudice the defendant's prospects for acquittal if the trial continued to a verdict. Rather, it appears that he took the chance that he could get it admitted into evidence without the proper foundation. Although the prosecutor's conduct in displaying the bedspread to the jury prior to the court's ruling on its admissibility was in a sense overreaching, we hold that it was not the type of overreaching which will bar retrial.

The defendant next argues that the trial court abused its discretion in allowing certain child witnesses to testify at his second trial in May 1979. The court found that the victim and two other children, all between five and six years old on the date of the alleged offense in 1977, were competent to testify.

■ The trial court, which sees the witnesses and hears their testimony, has broad discretion in determining the competency of witnesses. *State v. St. John*, 120 N.H. 61, 62, 410 A.2d 1126, 1127 (1980). Absent an abuse of discretion, this court, which must act on a cold record, will not disturb the trial court's determination of competency when there is evidence to support it. *Id.* at 62–63, 410 A.2d at 1127.

██ Here, as in *St. John*, the trial court carefully considered the capacity of the three juvenile witnesses and found them competent. The fact that the witnesses may have been uncertain about some things goes to the weight of their testimony and does not require the court to exclude it. *See State v. Keyes*, 114 N.H. 487, 489, 322 A.2d 615, 617 (1974). The record supports the trial court's finding of competency, and we find no abuse of discretion. The fact that some of the testimony of the juvenile witnesses was hearsay was cured by instructions to the jury regarding that testimony.

██ The defendant also argues that the evidence was insufficient to support a finding of guilt beyond a reasonable doubt. In deciding this issue, we must consider all the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Kiluk*, 120 N.H. 1, 4, 410 A.2d 648, 650 (1980). Circumstantial evidence may be sufficient to support such a finding. *State v. Kelley*, 120 N.H. 14, 16, 413 A.2d 300, 302 (1980).

██ There was evidence that a man took the victim to the third floor of the "brown house" where the defendant lived with his mother. The victim and a young playmate both identified the defendant as that man. Another friend of the victim testified that the victim went to the defendant's house to "see some puppies" and that, after informing the victim's mother, she later saw the victim, with blood on her face, on the steps of the defendant's house carrying her underwear and sneakers. This testimony was corroborated by the victim's mother, who testified that she found blood on the genitals of the victim and that, when she screamed at a man coming out of the second floor, the victim said "No, not him, Mommy, up there," pointing to the third floor where the defendant lived.

The State also introduced physical evidence to connect the defendant to the crime. An FBI agent trained in microscopic analysis testified that hair found on the defendant's bed and hair from the victim were morphologically similar, as were a strand of green woolen fiber from a green blanket in the defendant's bedroom and a green fiber found on the victim's sneaker. The agent testified that the defendant's hair was not similar to the victim's. The hair of other members of the Scarlett family, however, was not tested.

Medical examination of the victim revealed a tear in the vaginal area caused by a blunt object the size of a finger. There was

testimony that the tear could have been caused by a finger but that it was probably not caused by the entry of a male organ. The defendant claimed that he could not recall having assaulted the victim because he had blacked out as a result of drinking beer, smoking marijuana and taking valium. When questioned by the police in his room, the defendant stated that he "didn't give a shit about . . . [the victim] or what happens to her or anyone else."

In the previous appeal of this case, we stated:

> "Substantial evidence was presented to the jury linking the defendant to the crime. . . . Photographs of the defendant's apartment, . . . also served to connect the defendant to the crime. Most damaging of these was a photograph of an apparently blood-stained bedspread that covered the defendant's bed. . . ."

*State v. Scarlett*, 118 N.H. at 905, 395 A.2d at 1245. Although the bedspread was erroneously displayed to the jury at the first trial, it was properly admitted into evidence at the second trial. We cannot say that, based on this record, no rational trier of fact could find all the essential elements of the crime beyond a reasonable doubt.

The defendant's final argument relates to the testimony of John W. Hicks, an FBI agent, regarding the statistical probability of mistaken identity when there has been a positive comparison of two hair samples. Hicks conducted a microscopic examination of hair samples taken from the victim and of hair found on a green blanket in the defendant's bedroom, where the assault allegedly had occurred. At trial, he testified that the hair found on the blanket was similar to the victim's hair in fifteen recognized microscopic characteristics. This testimony was properly admitted. *See State v. Farrow*, 118 N.H. 296, 307, 386 A.2d 808, 815 (1978). Hicks then referred to a study conducted by a forensic laboratory in Canada and published in the JOURNAL OF FORENSIC SCIENCE in July 1975. He testified that the results of this study indicated that, when hair specimens are "found to be consistent with respect to all these different microscopic characteristics . . . , the chances of them having come from anyone else are forty-five to one." The defendant contends that this testimony is hearsay and that, because its admission was not harmless error, he is entitled to a new trial.

The challenged testimony regarding the statistical probability of mistaken identity was offered not to show the basis of any opinion given by the witness but as direct evidence. Unlike the

expert testimony in *State v. Coolidge*, 109 N.H. 403, 418–22, 260 A.2d 547, 558–61 (1969), *rev'd on other grounds sub nom. Coolidge v. New Hampshire*, 403 U.S. 443 (1971), which was based on the results of tests conducted by the expert himself, Hicks' testimony as to mathematical probabilities was not based on his own studies and calculations. Rather, Hicks testified as to the contents of a scientific journal which contained the findings of two other people, an expert in microscopic analysis of hair and a statistician who calculated the probability figure. There was no way for the fact-finder to evaluate the work or methods of either person. Moreover, the State did not offer the journal itself in evidence. Thus, the testimony in question was at least double hearsay, for it was based upon a periodical which itself had to have its authenticity proven to remove it from the realm of hearsay. Nor does this testimony come within any of the exceptions to the hearsay rule. We do not decide whether the journal would be admissible, but mention that it was not offered in evidence in order to illustrate the attenuation of the proffered testimony. *Cf.* FED. R. EVID. 803(18).

Nevertheless, even though the statistical probability testimony was erroneously admitted, we do not see how this particular testimony could have prejudiced the defendant. We may assume that the witness intended to say, but misspoke himself, that the chances of hair with such consistent characteristics having come from different people were one in forty-five, rather than "forty-five to one." Had he done so, his testimony would certainly have tended to link the defendant to the crime, and its admission would be reversible error requiring a new trial. *See United States v. Massey*, 594 F.2d 676, 681 (8th Cir. 1979); *State v. Carlson*, 267 N.W.2d 170, 176 (Minn. 1978). It may be that the article itself in fact stated the odds in favor of the defendant. This uncertainty, however, clearly reveals the danger of admitting hearsay evidence. The hearsay rule has a long and tried history and should not be lightly discarded or relaxed. In any event, the witness' testimony was favorable to the defendant because it suggested that the odds were forty-five to one that the hairs found in the defendant's bedroom were *not* the victim's. We assume that the jury understood the witness to be stating the probabilities in the defendant's favor, for such is the plain meaning of his testimony. Indeed, it would be speculation to assume otherwise, and we will not base a finding of harmful error on speculation. *Cf. State v. Staples*, 120 N.H. 278, 284, 415 A.2d 320, 323 (1980). We are satisfied beyond a reasonable doubt that the erroneous admission of the hearsay testimony in this case did not affect the verdict and

that, therefore, the error was harmless. *State v. Ruelke*, 116 N.H. 692, 694, 366 A.2d 497, 498 (1976). We therefore hold that the defendant is not entitled to a new trial.

*Exceptions overruled; affirmed.*

All concurred.